

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0083-23

---

### THE STATE OF TEXAS

### v.

### LINDSEY HRADEK, Appellee

---

### ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE EIGHTH COURT OF APPEALS
### EL PASO COUNTY

---

KEEL, J., delivered the opinion of the Court in which HERVEY, RICHARDSON, YEARY, NEWELL, WALKER, and SLAUGHTER, JJ., joined.   NEWELL, J., filed a concurring opinion in which WALKER, J., joined.   KELLER, P.J., filed a dissenting opinion.   MCCLURE, J., concurred.

### O P I N I O N

Appellee was convicted of recklessly causing serious bodily injury to her infant son and sentenced to thirteen years in prison.   The trial court granted her motion for new trial based on ineffective assistance of counsel ("IAC").   A majority of the court of appeals reversed the trial court's ruling and reinstated the conviction.   *State v. Hradek*,

2023 Tex. App. LEXIS 230 (Tex. App.—El Paso, January 12, 2023) (not designated for publication). The question here is whether the court of appeals applied the correct standard of review. We conclude that the court of appeals failed to view the record in the light most favorable to the trial court's ruling. The trial court's ruling was within the zone of reasonable disagreement, so we reverse the court of appeals's judgment and remand the case to the trial court.

## I. Charge and Trial

After her two-and-a-half-month-old son died, Appellee was indicted for intentionally or knowingly causing injury to a child by omission. The State later moved to amend the indictment to allege serious bodily injury. The jury charge authorized three possible verdicts: not guilty, guilty of intentionally or knowingly causing serious bodily injury by omission, or guilty of recklessly causing serious bodily injury by omission. The jury convicted her of the reckless charge. The trial's central issue was cause of death; the State's medical examiner said it was positional asphyxia, and the defense expert said that the cause could not be determined.

### I.A. The State's Evidence

Appellee's son, Colton, was born six weeks early and spent a week and a half in the neonatal intensive care unit. He had a medical history of breathing problems, including decreased oxygen and sleep apnea. He was hospitalized at three weeks of age for an upper respiratory infection and had multiple apnea episodes while in the hospital. After he was released from the hospital, he was prescribed an apnea monitor. His

pediatrician's records noted a week after his release from the hospital that he was on the apnea monitor and had had "no spells of apnea."

The medical equipment supplier and the pediatrician testified that the monitor should have been used for at least six weeks, but Appellee returned it after three weeks and signed a form acknowledging that she did so against medical advice. The pediatrician testified that an order from his office to discontinue the monitor would have been documented, but there was no record of such an order. He testified that apnea monitors are the best method for monitoring a child who has apnea or a high risk for SIDS, but parents sometimes find the monitors to be annoying because up to nineteen of twenty alerts are false alarms.

On October 9, 2012, less than three weeks after she returned the apnea monitor, Appellee found Colton non-responsive and called 911.[1] First responders arrived minutes later at 10:53 a.m. and briefly administered cardio-pulmonary resuscitation but only because their protocol required it—Colton was cold and had fixed lividity and rigor mortis. According to their records, the "mother" or "family" said he had been "down" for ten minutes, and "Dad" said they last saw him moving at 3:00 a.m. when he was fed.

Because lividity was fixed in the upper, right part of his body and head, and there was blanching on his upper thighs, responding officers surmised that Colton had been strapped into an overturned car seat that was found next to Appellee's bed. The car seat

---

1 The recording of the 911 call was not part of the court of appeals's record and has reportedly been lost during the appeal of this case.

was lying on its back with its base facing the wall; the lower left corner of the car seat appeared to be resting on a pile of pillows.

El Paso County deputy medical examiner Juan Contin determined that Colton died of positional asphyxiation; he could not breath because he was upside down, and the lividity indicated that he had been in that position for some time. Dr. Contin testified that Colton had deep lividity on the right side of his face, indicating that he was upside down and tilted to the right. There was little lividity in Colton's lower legs or on his left side. Colton had a marked "indentation" on his right thigh from either the car-seat strap or the diaper, but Dr. Contin said diapers do not usually cause such indentations.

Dr. Contin explained that lividity patterns are not exact because blood does not flow freely through the tissues, and its flow may be stopped by pressure. One such example was lividity in the back of Colton's legs because the diaper "was very tight" and prevented the blood from moving. Dr. Contin did not personally examine the scene or the car seat, and he could not say conclusively that Colton was in the car seat when he died, but he did not believe that Colton died while lying flat in a bed or sleeping in his crib. He believed Colton died while he was "upside down" and tilted to the right, and he remained in that position for many hours.

Dr. Contin's meaning of "upside down" is unclear from the record. He testified that it was like "sitting in an easy chair" and "towards the right"; Colton could have been positioned that way in the car seat or "on a pile of dirty clothing," but he was not lying in a bed. But parts of Dr. Contin's testimony suggested that Colton was face down. He

testified that Colton was "suspended by the straps at the thighs," and that his "head was floating in the air. Wasn't touching anything." Dr. Contin dismissed the absence of shoulder strap marks, saying that the "pressure was mostly on the thigh and not the shoulder; he was suspended[,]" and the shoulder straps would not leave marks if they were not tight.

In two video-recorded statements to police, Appellee denied that Colton had died in his car seat. She said her husband, Bobby Soto, grabbed the car seat in a panic when they found Colton was not breathing and then dropped the car seat by the bed when they called 911. In her first statement she said she usually put Colton in his crib but must have fallen asleep while feeding him because she woke up with him in the bed between her and Bobby. In her second statement, she said Colton would not sleep in his crib, so he routinely slept in bed with her and Bobby. She said she initially lied about Colton sleeping in the crib because she knew it was not safe for him to sleep in bed with them, and she was afraid that they would be blamed for his death. She thought that the slope of the mattress from Bobby's weight accounted for the lividity on Colton's face, head, and right side and that the blanching on his thighs was from the diaper. She said she always put Colton's diaper on too tight and it would leave marks on his legs, but she did so to keep it from leaking. She defended Bobby and did not believe that he would have done anything to hurt Colton. As for the discontinued apnea monitor, she claimed that it had not gone off in the three weeks that she used it and that someone from her pediatrician's office had told her Colton no longer needed it.

The State sought to introduce evidence that Appellee used cocaine around the time of Colton's death to show her state of mind. In an excerpt from a jail-recorded phone call between Appellee and her mother, Whitney, Appellee admitted that she used cocaine while her son was alive.[2] The trial judge ruled that the excerpt referencing cocaine use was admissible and asked the defense for its "thoughts on how much" of the recording's remainder to admit. The second-chair defense attorney replied, "All of it, Your Honor." It was admitted as State's Exhibit 51 and played for the jury.[3]

In the 43-minute recording, Appellee referenced her job as an exotic dancer, cursed out the medical examiner and his findings, complained about the unfairness of her incarceration, and claimed that she was in jail for cocaine use rather than her baby's death. She said everyone was making her regret her son, and she wished she had never gotten pregnant and that her son had never been born. She complained about being in jail; she did not believe she had done anything wrong and was focused on getting out on bond. She relayed her plan to dye her hair and get a spray tan when she got out of jail so no one would recognize her from news coverage of her case. She promised that she was "not going to go out and start dancing again," but she did not believe she could get a job because everyone had seen the case on the news. She dismissed her family's hardship in dealing with the situation and was concerned about being in jail, losing her son, being

---

2 The defense attorney opened the door to testimony that Appellee was tested for drug use as part of the investigation, and the test showed she had used cocaine within 48 hours.

3 State's Exhibit 51 is a four hour long recording consisting of multiple jail calls Appellee made. The call that was admitted at trial and played for the jury begins at 2:56:06 and lasts approximately 43 minutes.

called a murderer, and having her picture on the news. She expressed fear that the State could increase the charges against her and said she was considering pleading guilty.

Appellee said she was "125% sure" that Colton was next to her the whole night and that she would have felt it if someone had moved him because she was a light sleeper. She asked her mother to send her photos of Colton and Bobby and to put money in Bobby's commissary account. Toward the end of the call, she expressed feelings for Colton and tearfully said she just wanted him back, but her sadness was short lived. The next minute she was no longer crying and was again asking for more money for herself and for Bobby.

Whitney was frustrated with Appellee throughout the call. She expressed her love and support for Appellee but was sometimes dismissive, harsh, or angry. She told Appellee to stop listening to "jailhouse lawyers" and to follow her attorney's advice. She repeatedly admonished Appellee to tell the truth and take this seriously. She told Appellee to stop being so demanding. When Appellee mentioned that her jail friend charged with a more serious crime had been released on bond, Whitney pointed out that the friend's victims did not die and reminded Appellee that her baby died. Whitney pointed out Appellee's selfishness in complaining about unfairness and asked Appellee, "was it fair to Colton what happened?" She referred to the medical examiner's conclusion that Colton was upside down in the car seat when he died. Whitney suggested that Appellee undergo a "psych eval" and said everyone thinks she is a murderer.

**I.B.   Appellee's Evidence**

The defense presented Mark Shuman, a forensic pathologist who ruled out the car seat scenario as the cause of death.   Dr. Shuman testified that the blanching on Colton's thighs did not match the width of the car seat's straps or their probable location on Colton's body, nor did their weave pattern appear in the autopsy photos.   He testified that if Colton had been suspended in the car seat, there would have been blanching and lividity on his shoulders, but there was neither.   He noted, too, a discrepancy between the blanching on the thighs and the way the car seat's straps would have fit on his legs; that is, the blanching encircled Colton's thighs, which the car seat's straps would not do.   He associated the blanching's appearance with folded fabric or elastic and hypothesized that it was caused by the diaper.   He noted lividity on the back of the legs and found that inconsistent with the upside-down hypothesis.   He thought Colton died while on his right side or face down but not upside down.

Dr. Shuman criticized the State's failure to document the scene more thoroughly and the medical examiner's failure to test his car-seat hypothesis by placing Colton's body into the car seat.   He surmised that Colton was in the bed but did not believe enough investigation had been conducted at the scene to determine the cause of death. He agreed that it was unsafe for a young baby to sleep in an adult bed and said he regularly sees accidental infant deaths due to co-sleeping, but the parents are usually not prosecuted for such accidental deaths.   He said Colton had risk factors for unexplained death including prematurity, history of apnea episodes, age under six months, and low

weight, but without more investigation he could not say whether Colton died of suffocation in an adult bed or of sudden unexplained death. In his opinion, cause of death could not be determined, and the charges should not have been filed.

## I.C.   Closing Arguments

The defense argued for acquittal because Colton's death was an unexplained accident, and the State failed in its burden of proof; the detective came up with the car seat theory, and the medical examiner adopted it without investigating it. The defense urged the jury to listen to the 911 call because it captured Appellee's "panic and horror" as she tried "to breathe life into" Colton and contradicted the detective's testimony about his observations of Appellee and the apartment.

The State argued that it did not have to prove that Colton was in the car seat when he died, only that Appellee knowingly left him in an unsafe sleep position, knowing that he had sleep apnea, and that the bed and the crib were "both unsafe." It pointed out her inconsistent statements given during the investigation. The State maintained that Appellee used cocaine while Colton was asleep and vulnerable and knowingly put him in an unsafe sleep position, leaving him "to die for hours" and that her conduct was at least reckless.

## II.   Motion for New Trial

At the motion-for-new-trial hearing, the second-chair defense attorney, Nicole Maesse, testified that she had not listened to the recording of the phone call before she requested that it be played for the jury; the lead attorney told her to request its admission,

and she assumed he had listened to it. If she had listened to it beforehand, she would not have admitted it. She agreed that much of its content was prejudicial to Appellee, presented her in a negative light, showed her to be a bad person generally, and was hurtful to her case.

Maesse testified that she would encourage her client to present herself as taking the situation seriously and would advise against cussing in court. She would object to evidence that a client was in jail, was considering a guilty plea, or believed she might spend the rest of her life in prison. She would object to a witness's opinion testimony that the client was lying or untruthful or might have anger issues. She would not want evidence admitted showing that the client's mother thought the client had mental health issues. In defending against a charge of injury to a child, she would object to lay opinion testimony that the client might have hurt the decedent, the situation was unfair to the decedent, and the client should think about the decedent. She would not want a family member or other witness to say the prosecution had a lot of evidence against the client. She would not want evidence presented that the client regretted having a baby or getting pregnant with the child she allegedly caused to die; it would "annihilate" the defense case. She would not knowingly offer that kind of evidence, and she would object if the State offered it. But the phone call included that kind of evidence.

The lead defense attorney, Dave Contreras, testified similarly but inconsistently. The trial court found that he was not credible when he testified that he had listened to the entire recording before it was introduced but credible when he testified that he had

listened only to the snippet offered by the State. He said his trial strategy was to show that the State did not prove its case because there was no omission; the cocaine use, unsafe sleep arrangement, and returning the apnea monitor were all acts.

The trial court found that absent the defense request to admit the entire recording, only the cocaine-use excerpt would have been admitted, and its remainder included prejudicial material like Appellee wished her son had never been born, wished she had never gotten pregnant, was not taking this seriously, hurt the baby, was considering pleading guilty, was a stripper, and had anger and mental health issues. Referring to the recording, the trial court found that defense counsel realized that "the whole thing" was bad. The trial court found no credible, reasonable trial strategy for defense counsel to request that the entire phone call be admitted. It concluded that portions of the call were highly inflammatory and inadmissible, the probative value of the call was substantially outweighed by the danger of unfair prejudice, its admission was unjustified by any objectively reasonable trial strategy, and without the recording's admission and other errors by the defense, there was a reasonable probability of a different, better outcome. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).

## III. Appeal

A majority of the court of appeals overruled the trial court. *Hradek*, 2023 Tex. App. LEXIS 230, at *17. It acknowledged the deferential standard of review applicable to new-trial rulings, but it applied the *de novo* standard applicable to IAC prejudice

claims. *Id.* at \*18-21. It broke the call down into two categories: comments on Appellee's credibility and comments related to her guilt or innocence. *Id*. at \*55-56.

The court of appeals considered the following aspects of the call as diminishing Appellee's credibility: her topless-dancing job, Whitney's belief that Appellee underappreciated the seriousness of her case, Whitney's repeated demands that Appellee tell the truth, Whitneys' suggestion that Appellee get a "psych eval" while in jail, Appellee's expressions of regret over Colton's birth, and Appellee's use of profanity. The court of appeals determined that no evidence in the new trial hearing showed whether or how these statements prejudiced Appellee at trial, and without such evidence, *Strickland*'s prejudice standard was not met. *Hradek*, 2023 Tex. App. LEXIS 230, at \*61. The court concluded that without such a showing, the record did not support a finding that the evidence undermined the reliability of the verdict. *Id*.

The court next addressed comments related to Appellee's guilt or innocence, including Whitney's implying that Appellee was involved in Colton's death and that Appellee was considering pleading guilty. *Id*. at \*62-63. The court determined that there was no evidence that Whitney's comments about Appellee's role in Colton's death affected the jury. *Id*. at \*63. The court acknowledged that plea offers are generally inadmissible and that a defendant's consideration of a guilty plea could prejudice the jury and undermine the verdict. *Id*. at \*63-64. But the court discounted the likelihood of prejudice from this evidence because Appellee maintained her innocence throughout the call, and the jury found her guilty of the lesser offense of reckless injury to a child. *Id*.

The court of appeals reasoned that the phone call was only 43 minutes in about 20 hours of testimony, and it allowed Appellee to protest her innocence without cross-examination and to support her defense that she was guilty only of reckless omission. *Id*. at *65. The State did not emphasize the evidence from the call. *Id*. at *65-66. And Appellee's theory of the case supported the jury's verdict; she knew it was unsafe for Colton to sleep in bed with her, but she allowed it anyway. *Id*. at *66-68.

The court of appeals said there was no tangible evidence of prejudice under *Strickland*. *Hradek*, 2023 Tex. App. LEXIS 230, at *68. It said that properly admitted evidence, including the defense theory of accidental death, supported the jury's verdict of reckless injury to a child and therefore disagreed with the trial court's determination that, but for defense counsel's erroneous admission of the jail call, there is a reasonable probability that the outcome of the case would have been different. *Id*. at *68-69. The court concluded that without evidence of prejudice, the trial court improperly granted a new trial based on ineffective assistance of counsel. *Id*. at *69. The court of appeals reversed the trial court's ruling and affirmed Appellee's conviction. *Id*.

The dissent emphasized the deferential standard applicable to rulings on new-trial motions. *Id*. at 73-75 (Palafox, J., dissenting). It disagreed with the State's contention that the jail call was at most minimally prejudicial or was cumulative of other admissible evidence. *Id*. at *100-01. It noted that the applicable standard requires viewing the evidence in the light most favorable to the trial court's ruling. *Id*. at *114. It said that under this standard, the record supported the trial court's conclusion that the highly

inflammatory and inadmissible comments in the jail call contributed to the prejudicial harm resulting from counsel's deficient representation. *Id*. It maintained that the prejudicial evidence portrayed Appellee in a negative light, damaged her credibility, and led to a breakdown in the adversarial process. *Id*. at *116 (citing *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018)). The dissent concluded that there was a reasonable probability that, but for defense counsel's erroneous admission of otherwise inadmissible evidence, the jury would have had a reasonable doubt about Appellee's guilt. *Hradek*, 2023 Tex. App. LEXIS 230, at *117.

We granted Appellee's ground for review:

When four judges have considered whether to properly grant a motion for new trial and two of them have decided that such a motion was properly granted, then that decision cannot be outside the zone of reasonable disagreement. The two-justice majority of the Court of Appeals never explicitly found that the trial court's decision was either arbitrary or unreasonable, and their Opinion failed to give proper deference to the trial court's ruling. When reviewing the Court of Appeals' decision, it is clear the State was unable to show that trial counsel's decision to order his subordinate attorney to play the entirety of one of, if not, the most damning piece of evidence in the entire trial and admit it into evidence did not undermine confidence in the outcome.

For reasons explained below, we reject Appellee's assertion that an even split among judges might be the measure for an abuse of discretion, but we agree that the court of appeals failed to give proper deference to the trial court's fact findings.

## IV. IAC Prejudice Standard of Review

IAC claims have two elements: deficient performance and prejudice. *Strickland*, 466 U.S. at 687. The prejudice element is fulfilled by a reasonable probability of a

better outcome but for the deficient performance. *Id*. at 694. Prejudice requires a reviewing court to examine "the totality of the evidence" heard by the factfinder and determine whether the result of the proceeding is "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Miller*, 548 S.W.3d at 499 (quoting *Strickland*, 466 U.S. at 695-96).

IAC prejudice is a mixed question of law and fact, and some questions of fact may turn on the credibility and demeanor of the witnesses who testify in the new-trial hearing. *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). Appellate courts should afford almost total deference to a trial court's determinations of those questions. *Id*. (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). Mixed questions of law and fact that do not depend on an evaluation of credibility and demeanor may be reviewed *de novo*. *Guzman*, 955 S.W.2d at 89. Unless the trial court is in "'an appreciably better position' than the appellate court to decide the issue, the appellate court may independently determine the issue while affording deference to the trial court's findings on subsidiary factual questions." *Id.* (quoting *Villarreal v. State*, 935 S.W.2d 134, 13 (Tex. Crim. App. 1996) (McCormick, P.J., concurring)).

In reviewing the trial court's grant of Appellee's motion for new trial, the court of appeals cited *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005) for the proposition that the "ultimate question of whether prejudice existed is reviewed *de novo*." *Hradek*, 2023 Tex. App. LEXIS 230, at *21. But the court of appeals failed to include the rest of the standard articulated in *Johnson*: "While the ultimate question of prejudice

under *Strickland* is to be reviewed *de novo*, the trial court should be afforded deference on any underlying historical fact determinations." *Johnson*, 169 S.W.3d at 239.

## V. Analysis

The trial court's prejudice conclusion depended on an evaluation of the credibility and demeanor of the new-trial witnesses and the probable impact of State's Exhibit 51 on Appellee's chances for acquittal. It was in an appreciably better position to make those assessments than an appellate court because it saw and heard the evidence, significant parts of which are ambiguous on the cold record or, as with the 911 call, missing in action.

The trial court's prejudice conclusion is supported by Maesse's opinion testimony that State's Exhibit 51 annihilated the defense, and that opinion, in turn is supported by the exhibit's contents. The unguarded, unfiltered conversation suggested that Appellee's own mother thought she was unserious about her case, untruthful about the cause of Colton's death, and self-centered. It exposed Whitney's suspicions that Appellee hurt Colton and might have mental health issues and revealed Appellee's regret about Colton's birth.

How impactful was State's Exhibit 51? The trial court was best positioned to assess its effect on the chance of acquittal because it heard and saw the trial testimony and its attendant gestures and demonstrations that flesh out the cold record. The most significant and ambiguous passages were about the cause of death. For example, as it appears in the record, Dr. Contin's in-court demonstration of "upside down" is

meaningless; it consists of his request to put his feet on the furniture and his testimony that Colton was "upside down like this, with the legs like this (indicating)." Similarly, the grainy, black-and-white copies of the autopsy and scene photos whose significance was highlighted by witnesses' "like this" commentary hinder our efforts to evaluate the record, but the trial court could see the original photos and the "like this" gestures. In addition, the trial court heard Appellee's 911 call, but we cannot; it was not part of the appellate record and seemingly has been lost during the pendency of the appeal.

Even from the cold record, however, Dr. Contin's testimony was problematic for the prosecution because it was internally inconsistent. He testified to mutually exclusive meanings for "upside down"—face down (head floating free) or face up (reclining). And he undermined his primary, car-seat hypothesis by offering an alternative, "pile of dirty clothing" scenario that would not have accounted for the blanching on the thighs after he had insisted on the car seat's straps as the cause of those marks. He was also inconsistent by dismissing the possibility that the diaper caused the thigh marks but attributing the lividity on the back of Colton's legs to the "very tight" diaper. Moreover, his opinion about cause of death was challenged by Dr. Shuman who pointed out the discrepancies between the lividity pattern and the car seat's configuration and offered different explanations for the observed patterns: the slope of the bed due to Bobby's weight on it and the diaper's leg openings causing circumferential blanching of Colton's thighs.

The court of appeals redeemed the phone call in part on grounds that it allowed Appellee to proclaim her innocence without subjecting her to cross-examination, an argument that the State echoes. But the video recordings of her police interrogations served the same function, and they did so more appealingly. In the videos, Appellee was articulate, polite, and rational, but in the phone call she was profane, angry, whining, grasping.

The court of appeals reasoned that the jury could have believed the State's theory and convicted Appellee of reckless injury even if it disbelieved the car-seat hypothesis because she used cocaine and let Colton sleep in her bed knowing that it was an unsafe sleep position. But even if Appellee's cocaine use was evidence of her recklessness, it was not compelling because there was no evidence that she used it on the night Colton died. The evidence that she used cocaine near the time of his death was admitted only because the defense opened the door to it with its inept cross-examination of one of the detectives. And as a persuasive matter, Appellee's claim that she let Colton sleep in her bed after being advised against it was far less damning than the idea that she left him for hours upside down in his car seat. The former seems common, natural, and nurturing, but the latter is aberrant, cruel, and callous. In short, Appellee's defensive theory was more viable before State's Exhibit 51 was played for the jury.

The court of appeals reasoned that the conviction for the lesser offense of reckless injury instead of intentional or knowing injury defeats any claim of prejudice from the admission of State's Exhibit 51. *Hradek*, 2023 Tex. App. LEXIS 230, at *64-65. But

the acquittal for the greater charge testifies more to the State's overreaching with its initial charging decision than it undermines the trial court's prejudice conclusion. There was no evidence of intent to kill, and the case that Appellee knowingly killed Colton was weak, at best, as suggested by the State's fallback request for the recklessness option. The court of appeals also mischaracterized Appellee's defense as a claim "that she was only guilty of reckless omission." *Id*. at *65. That was not her defense. Her defense aimed for acquittal, and the jury was instructed on recklessness over her objection.

The court of appeals did not explicitly address the phone call's prejudicial effect. Instead, it re-evaluated the evidence and concluded that it was sufficient to support the conviction. It reasoned that even without the phone call's inadmissible evidence, the jury could have determined that Appellee was reckless in using cocaine, returning the sleep apnea monitor, and placing Colton in an unsafe sleep position. But sufficiency of the evidence is not the standard for evaluating IAC prejudice or a trial court's grant of a new trial. Rather, prejudice depends on a reasonable probability of a different outcome, and a ruling granting a new trial will be upheld unless it is arbitrary or unreasonable. *Strickland*, 466 U.S. at 694 (referencing IAC prejudice standard); *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024) (referencing standard for reviewing new trial ruling).

The State proposes alternate interpretations of the evidence and says the inadmissible parts of the call were cumulative of other properly admitted evidence. For example, it says that Whitney's comments about the evidence against Appellee recounted

evidence from the investigation that was properly admitted at trial, and Whitney telling Appellee to take the matter seriously and tell the truth was cumulative of the detectives asking her about the night Colton died. But consider the source; it is one thing to have a law enforcement officer recount the evidence or interrogate a suspect, but it is another for the suspect's mother to do so. According to the State, Appellee's consideration of pleading guilty was an expression of frustration at facing prosecution for a crime she did not think she committed, and her cussing demonstrated the passion with which she believed in her innocence. But she protested her innocence in the video interviews without cussing and without expressing an interest in pleading guilty. State's Exhibit 51 undermined those more pristine claims of innocence. The State argues that Appellee's expression of regret about Colton's birth would be seen as insincere because she also said she regretted losing him, but it still jeopardized any sympathy the jury might have had for her.

The dissenting opinion has a different take. It argues that much of State's Exhibit 51 was admissible, and removing the admissible parts from consideration changes the prejudice result. Dissenting Op. at 2 (Keller, P.J., dissenting) (citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993)). The trial court found, however, that no part of the recording other than the cocaine excerpt would have been admitted but for the defense request to admit it in its entirety, and the dissent does not show that such a ruling would have been an abuse of discretion. *See State v. Mechler*, 153 S.W.3d 435, 439 (Tex.

Crim. App. 2005) (holding evidentiary rulings rest in the trial court's discretion). Without such a showing, the rest of the recording is pertinent to the prejudice analysis.

The defense's erroneous admission of highly inflammatory, prejudicial evidence had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. *See, e.g.*, *Strickland*, 466 U.S. at 695-96. The recording destroyed Appellee's defense that Colton's death was a SIDS tragedy that could happen to any mother; it portrayed her as a self-centered, possibly mentally-ill, exotic dancer who wished her son had never been born. Whitney's comments on the evidence against Appellee, her admonishments that Appellee should tell the truth and take this seriously, and her angry questions asking Appellee if this was fair to Colton were unlike the medical examiner's testimony or the police questioning of Appellee as part of the investigation. And there was no other evidence showing Appellee's flippant attitude, self-centeredness, or regret that her son was born. Thus, the trial court's assessment of the recording's prejudicial effect was not arbitrary or unreasonable.

## VI.  Conclusion

There are two plausible interpretations of State's Exhibit 51: Either it was so prejudicial that there is a reasonable likelihood that it extinguished Appellee's chances of acquittal, or it was not so bad. The trial court was better positioned to make that call, and its ruling was within the zone of reasonable disagreement. *See Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021) ("[I]f there are 'at least two' plausible interpretations of the evidence, it is within the trial court's exclusive purview to decide

which interpretation to believe."); *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017) ("The trial court's ruling is within the 'zone of reasonable disagreement' when there are two reasonable views of the evidence.").   We reverse the judgment of the court of appeals and remand to the trial court for further proceedings.


Delivered:   December 11, 2024

Publish